JANVIER, Judge.
Plaintiffs, Dr. and Mrs. Charles J. Stewart, and Mrs. Stewart’s mother, Mrs. Azema Cassagne Grundman, having bought from Barataría Development Corporation “production interest assignments”, brought this suit against said corporation and members of its Board of Directors, charging that they had been induced to make the said purchases by fraudulent misrepresentations as to the holdings of the said corporation, and that the said interest assignments were of no value because of the fact that much of the acreage, purported to be held under lease by the corporation, was not so held. Plaintiffs prayed for judgment against the said corporation and each of the said members of its Board of Directors, ordering the return to them of the amounts paid, Dr. and Mrs. Stewart praying for judgment for $1,600 and Mrs. Grundman praying for judgment for a like amount.
Defendants denied that there had been any fraud or misrepresentations, averring that the plaintiffs had acted on their own initiative because of the fact that they knew of other prominent persons who had made similar purchases and that in making the said purchases plaintiffs had been prompted by the hope of making quick and large profits.
There was judgment in favor of plaintiffs as prayed for against the corporation and its President, Joseph K. Handlin, but dismissing the suit against the other defendants. The corporation and Handlin have appealed.
The Barataría Development Corporation was organized by Handlin, the President, and Mrs. Agatha Fisher Mayronne, together with one or more attorneys. Mrs. Mayronne and Handlin owned 95% of the stock and the other five per cent was given to the attorneys for services rendered.
Mrs. Mayronne and Handlin owned certain mineral leases, and it was found advisable to add to this acreage in order to induce some responsible driller to explore for minerals, and the purpose of the organization was to secure other leases so that sufficient acreage might be held by the corporation. In order to acquire additional acreage and to pay the rental on such acreage as it held, the corporation sold produc *719 tion interest assignments under which a purchaser was assigned a certain percentage of such minerals as might be produced. The purchasers of these assignments had no voice whatever in the management of the corporation.
At sometime prior to January, 1956, the corporation held leases on approximately 3,100 acres of land. Of this amount 950 acres were owned by Mrs. Mayronne and about 350 were owned by the Fisher Estate of which Mrs. Mayronne was the owner, so that, at that time Mrs. Mayronne had the right to determine whether her acreage should be continued under the lease agreement, and the record indicates that, in addition to the acreage which she owned, she had the controlling voice in determining whether the 350 acres of the Fisher Estate should also be continued under the lease to the corporation.
While the holder of these assignments had no voice in the management of the corporation and had only the hope of obtaining a percentage of the minerals which might be produced on the lands held under lease by the corporation, Mrs. May-ronne and Handlin were interested not only in their share of the minerals produced, but were also entitled to fixed percentages of the profits of the corporation, and Handlin was allowed an operating account for expenses of more than $900 per month.
The lease on the lands controlled by Mrs. Mayronne expired in January, 1956, and Mrs. Mayronne was unwilling to renew those leases except on terms which were more favorable to her. Negotiations were in process, she demanding much more favorable terms and refusing to agree to the extension of her leases and the Fisher leases unless her terms should be agreed to. At that time she had executed extensions of the leases and had given them to her personal attorney with instructions that they were to be retained by him and not delivered to the corporation until she and the corporation should come to terms acceptable to her.
In April, 1956, approximately three months after the Mayronne and Fisher leases had expired and had not been renewed, Dr. and Mrs. Stewart heard of the operations of the corporation and determined to investigate the advisibility of purchasing an interest in its operations. Accordingly, Mrs. Stewart called on Hand-lin, the President of the corporation, and learned of other prominent persons who had made investments in production interest assignments. She discussed with Handlin the prospects of the corporation and was shown by him a map on which the lease-holdings appeared, and on this map appeared the acreage of Mrs. Mayronne and of the Fisher Estate, which had expired and had not been renewed. There was also a document known as Schedule A, which had been prepared sometime before that, and on this document appeared the Mayronne and the Fisher leases as being held by the corporation. According to Mrs. Stewart, Handlin told her of these large leaseholdings, particularly told her of the Mayronne and Fisher leases, and told her also that a large drilling company was interested in securing the drilling contracts on the lands held under lease by the corporation and told her of, or had her listen to, the recording of a telephone conversation supposedly held with the attorney for a large drilling corporation indicating that that corporation was interested in commencing drilling operations.
The defendant, Handlin, did not deny any of the statements of Stewart and attempted to explain the reference to the Fisher and Mayronne leases by saying that he knew that the extensions had been executed. As a matter of fact as already stated, though the extensions had been executed, the personal attorney of Mrs. Mayronne had those extensions in his possession, and Handlin knew that the extensions were not to be delivered and not to be made effective until Mrs. Mayronne should agree to that delivery. As a matter of fact, no agreement was ever arrived at with Mrs. May-ronne, the extensions were never delivered, and apparently, as a result of the loss of *720 those holdings, no drilling operations were commenced and the production interest assignments proved of little, if any, value.
When Mrs. Stewart made the purchase of the interest for herself and her husband, which was on April 26, 1956, Handlin does not deny that he told her that there was only one such interest assignment left and that she was very lucky to be able to get it. Therefore, acting on what she had heard about the interest of others and on what she was told by Handlin, Mrs. Stewart paid to him for the corporation $1,600 for the interest assignment which she and her husband purchased.
A short time later Mrs. Stewart talked the matter over with her mother, Mrs. Grundman, the other plaintiff, and Mrs. Grundman, believing that the investment would prove profitable, called on Handlin and was told by him what he had already told Mrs. Stewart. Mrs. Grundman indicated interest in purchasing an assignment, and Handlin told her that she was very lucky because he had been able to find one more assignment which she bought, paying $1,600.
Mrs. Mayronne stated that she did not know that these assignments were being sold and that she would have objected to the sale had she known.
Defendants make several contentions. In the first place, though they do not contradict to any appreciable extent the testimony of Mrs. Stewart and Mrs. Grundman, they attempt to escape liability by showing that the corporation was honestly operated and by arguing that the extensions referred to had actually been executed. Handlin also attempts to avoid personal liability on the ground that he was acting as President of the corporation and therefore should not be held liable for any of its debts. The corporation, as a matter of fact, was a mere shell. Mrs. Mayronne testified that “we were the corporation”, meaning herself and Handlin, and Plandlin referred to the corporation as a mere “shell”. Defendants also relied to some extent on the contention that the purchasers could have ascertained the truth as to the leaseholdings by examination of the public records.
We know of no reason why, under such circumstances, the prospective purchasers should first investigate public records to determine the truth of such matters as were told them by the President of the corporation.
Furthermore, under the circumstances shown here, we see no reason why the President of the corporation, making what must be termed fraudulent statements, should not be held liable to persons sustaining losses as a result of relying on those fraudulent misrepresentations.
Our conclusion is that both the President and the corporation itself are liable for the losses sustained.
Accordingly, the judgment appealed from is affirmed at the cost of appellants.
Affirmed.